IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KRISTIN SAMUELSON,

       Plaintiff,

v.

       Case No. 6:15-cv-01648-MC
       OPINION AND ORDER

OREGON STATE UNIVERSITY, and
MIKE RILEY, as an individual,

       Defendants.

MCSHANE, Judge:

       While a freshman at Oregon State University (OSU) in 1999, plaintiff Kristen Samuelson was raped off campus after being drugged at an off campus party. Her assailant was neither a student nor an associate of the university. Ms. Samuelson brings one Title IX claim against OSU and two 42 U.S.C. § 1983 claims against Mike Riley, the head football coach at OSU during the relevant time period. Because OSU lacked meaningful control over either the location of Ms. Samuelson's assault or the attacker himself, the Title IX claim is dismissed. Because no state official in Mr. Riley's position at the time would reasonably have been on notice that they were liable for an off-campus sexual assault by a non-student, the 1983 claims against Mr. Riley are dismissed.

1 – OPINION AND ORDER

## BACKGROUND[1]

On October 9, 1999, Ms. Samuelson, a freshman at OSU, was drugged at an off-campus

party and then raped in an off-campus apartment. Ms. Samuelson woke up during the assault and

"was in a bedroom with OSU football jerseys and team pictures on the walls. The name Carlyle

was on the back of one of the football jerseys and team pictures on the walls." Compl. ¶ 8. A few

days later, Ms. Samuelson reported the rape to OSU:

10.

On or about October 11 or 12, 1999, Plaintiff reported being raped to OSU's
sexual assault counselor at OSU's Student Health Services. OSU's sexual assault
counselor said to Plaintiff: (a) maybe Plaintiff had said "yes", (b) a rape kit was
worse than the assault itself, (c) "these things are hard to prove", (d) it would be
blamed on Plaintiff, (e) Plaintiff should not have been drinking, gave her meeting
times for Alcoholics Anonymous, and then had no further contact with Plaintiff,
and upon information and belief, took no further action. No one else from OSU
contacted Plaintiff thereafter about the assault or, upon information and belief,
took any other action either.

11.

OSU's sexual assault counselor's words, inaction, and blame, caused Plaintiff to
feel even more shame, humiliation, and emotional distress than she had felt after
being assaulted, was dissuaded from seeking any further help from OSU, and
consequently did nothing more to hold her perpetrator accountable for his crime.

12.

During this time, OSU failed to take corrective action to end the hostile
educational environment Plaintiff experienced because of the rape and ensure
Plaintiff's full and equal access to educational benefits and opportunities.

Compl.

Before the rape, Ms. Samuelson was an excellent student. "After the rape and OSU's

hostile response, Plaintiff attempted to continue her studies, but was too distraught, isolated,

---

[1] At the motion to dismiss stage, I assume the truth of all of Samuelson's allegations.

anxious, and depressed to attend class and focus on her studies." Compl. ¶ 13. Ms. Samuelson failed at her studies and left OSU after her first year.

Fifteen years later, on November 14, 2014, Ms. Samuelson read an Oregonian article describing a similar sexual assault of another student that would have pre-dated Ms. Samuelson's assault by a year.[2] Ms. Samuelson learned Brenda Tracy had been raped on June 24, 1998 by two OSU football players and two other men. The incident surrounding the rape of Ms. Tracy occurred in the same apartment in which Ms. Samuelson was raped. Like Ms. Samuelson, Ms. Tracy was drugged. Like Ms. Samuelson, Ms. Tracy reported the rape to OSU's sexual assault counselor. Calvin Carlyle, an OSU football player, was alleged by Ms. Tracy to be one of her assailants. Ms. Samuelson later learned her attacker was Calvin Carlyle's cousin. Compl. ¶ 16.

Ms. Tracy's rape generated much publicity and threatened donations to OSU. Compl. ¶ 19. Ms. Samuelson, still in high school in 1998, did not see any of the publicity surrounding Ms. Tracy's sexual assault. Compl. ¶ 19.

Only upon reading the 2014 Oregonian article did Ms. Samuelson realize OSU essentially ignored a brutal rape of one of its students and failed to take any corrective action:

> She also discovered in the winter of 2014 and early 2015, after Ms. Tracy made her report, [OSU's sexual assault counselor] and other OSU officials failed to take corrective action, including (a) end the hostile and sexually violent culture toward women permitted by OSU's football program, (b) create and implement more effective sexual assault prevention policies, (d) prepare and present training programs for students, coaches and faculty about consent and appropriate sexual conduct, (e) investigate sexual assault allegations impartially and comprehensively, (f) engage law enforcement, (g) craft discipline commensurate with the severity and frequency of the acts of sexual harassment and violence by OSU's football players and their associates, and (h) have ongoing emotional, psychological, and educational on-campus support and off-campus resources for sexual assault victims.

---

[2] The Oregonian is a newspaper based in Portland, Oregon.

3 – OPINION AND ORDER

Compl. ¶ 15.

Following Ms. Tracy's sexual assault, Mr. Riley's remarkably inadequate response was

to suspend Carlyle and the other football player for one game. In a similar vein of moral

blindness, OSU placed both players on "school probation, told them to perform 25 hours of

community service and to attend an educational program." Compl. ¶ 20.

> Ms. Samuelson did not discover until the winter of 2014 and early 2015 that OSU
> had actual knowledge of the risk of rape by student athletes and thus that it was
> foreseeable that female students would be raped in the future, and that OSU had
> failed to reevaluate its sexual assault prevention policies and procedures, training,
> investigation methods, football culture and system for supporting students who
> had been raped, and had failed to create and implement more protective and
> supportive and rehabilitative methods, policies, and practices.

Compl. ¶ 22.

In addition to the above general allegations, the complaint contains the following

allegations specific to each claim:

## Title IX Claim: Deliberate Indifference to Prior Sexual Violence

From the police report Ms. Tracy provided to the OSU sexual assault counselor in 1998,

OSU knew "that Carlyle associated with sexually violent males" and participated in Ms. Tracy's

rape. Compl. ¶ 24. OSU also knew football coaches suppressed other reports of sexual abuse

towards females by OSU football players. *Id.* Samuelson alleges:

25.

> OSU had actual knowledge of the hostile culture toward women permitted by
> OSU's football program and history of sexual assaults and harassment towards
> women by OSU's football players. OSU also had actual knowledge of the
> substantial risk that Carlyle would associate with other sexually violent males
> who would sexually harass OSU's female students at his apartment based upon
> prior conduct by Carlyle and his associates.

4 – OPINION AND ORDER

26.

OSU officials, administrators, and football coaches, with the knowledge described above, had the authority and opportunity to address the risk posed by Carlyle and other sexually violent males with whom Carlyle associated, and the authority and opportunity to reform the football program's hostile culture toward women, and had the authority to institute corrective measures, such as:

a) terminating Carlyle's athletic scholarship and expelling him from OSU;

b) investigating reports of rape and sexual assault and then taking swift action to prevent their recurrence;

c) adequately training OSU's sexual assault counselors;

d) creating, implementing, and maintaining adequate sexual assault prevention policies and procedures;

e) providing ongoing emotional, physical, and psychological support to OSU's female students after being raped;

f) providing academic assistance, adjustments, accommodations, and support to OSU's female students after being raped and while suffering from anxiety, depression, and post-traumatic stress disorder;

g) providing counseling, health, mental health, victim advocacy, legal assistance, and other services both on-campus and in the Corvallis community to assist sexual assault survivors.

\* \* \* \*

28.

OSU's conduct was deliberately indifferent to the substantial risk that Carlyle would associate with other sexually violent males who would sexually harass OSU's female students or that there would be a recurrence of sexually violent conduct at apartments of OSU's football players.

29.

As a result of OSU's deliberate indifference, Plaintiff was subjected to extreme sexual harassment in the form of rape by Carlyle's cousin in the same apartment where Carlyle and three other men had sexually assaulted Ms. Tracy, more than a year before.

\* \* \* \*

31.

OSU was deliberately indifferent to reports of rape and sexual misconduct by (a) failing to investigate reports of rape and sexual misconduct by Ms. Tracy and Plaintiff properly, (b) failing to notify law enforcement of Plaintiff's rape, (c) discouraging Plaintiff from reporting the sexual assault to law enforcement, (d) minimizing or covering up the discriminatory import of Ms. Tracy's and Plaintiff's reports of sexual assault to OSU, and (e) continuing to use ineffective methods to address sexual assaults of OSU's female students as more specifically described in paragraph 25, herein fully incorporated by reference.

32.

OSU's deliberate indifference was intended to protect its fundraising efforts, which were heavily dependent on donors' positive regard for OSU's football program and the image of a safe campus, and consequently OSU subjected Plaintiff to a hostile educational environment so severe, pervasive, and objectively offensive that it effectively barred her access to educational opportunities and benefits.

Compl.

**Substantive Due Process and Equal Protection Claims Under Section 1983**

These claims, against Mr. Riley individually, contain similar allegations. Ms. Samuelson

alleges Mr. Riley had actual knowledge of "Carlyle's association with sexually violent males and

[was aware of Carlyle's] participation" in Ms. Tracy's rape. Compl. ¶ 37. Mr. Riley also knew of

the football program's hostile culture towards women, and the "custom or practice of ignoring or

suppressing reports about sexual misconduct by OSU's football players toward females." *Id.*

Riley made no efforts or minimal efforts to reform the football team's hostile and sexually violent culture towards women by, such as, advocating for more protective sexual assault prevention policies, disciplining assistant coaches who ignored or suppressed reports of sexual misconduct by players, training players about consent and appropriate sexual conduct with women, and disciplining players in a manner that was commensurate with the severity and frequency of instances of sexual harassment by OSU's football players.

Compl. ¶ 38.

6 – OPINION AND ORDER

Finally, "Riley's deliberate indifference to these known and obvious dangers exposed Plaintiff to danger she would not otherwise have faced." Compl. ¶ 39.

## STANDARDS

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter that "state[s] a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face when the factual allegations allow the court to infer the defendant's liability based on the alleged conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The factual allegations must present more than "the mere possibility of misconduct." *Id.* at 678.

While considering a motion to dismiss, the court must accept all allegations of material fact as true and construe those facts in the light most favorable to the non-movant. *Burget v. Lokelani Bernice Pauahi Bishop Trust*, 200 F.3d 661, 663 (9th Cir. 2000). But the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. If the complaint is dismissed, leave to amend should be granted unless the court "determines that the pleading could not possibly be cured by the allegation of other facts." *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

## DISCUSSION

### I. Title IX Claim Against OSU

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. provides that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Over the past 40 years, the scope of liability for schools (i.e. "recipients") under Title IX has evolved considerably. As described

below, for a recipient to be liable for sexual harassment under Title IX, it must exercise some control over the context of the harassment and the harasser.

In 1979, the Supreme Court first held that Title IX contains an implied right of action when a woman alleged a medical school denied her admission because she was a woman. *Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979). In 1992, the Supreme Court concluded the implied right of action in Title IX supported a claim for monetary damages. *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 76 (1992). Franklin, a high school student, was subjected to "continual sexual harassment" from a teacher and coach of the school. The harassment included several occasions where the teacher pulled Franklin from another class and then subjected Franklin to "coercive intercourse" in his office. Although the school investigated the sexual harassment of Franklin and other students, it took no steps to stop it. Because Congress did not demonstrate any intent to limit the remedies available under Title IX, the Court concluded monetary damages are available in an action to enforce it. *Id.* at 75.

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) involved sexual harassment of a student by a teacher. After making sexually suggestive comments in the classroom, the harasser eventually had sexual intercourse with the student on numerous occasions during class time (but never on school property). Although the student never reported the harassment, parents of two other students reported the teacher's inappropriate classroom comments to school officials. The principal did not report the complaints to the district's Title IX coordinator. Three months later, a police officer caught Gebser and her teacher having sex.

The Court confirmed that traditional agency and *respondeat superior* principles do not apply when assessing a district's liability under Title IX. *Id.* at 285 (allowing damages against district absent actual knowledge of harassment would "frustrate the purpose" of Title IX).

8 – OPINION AND ORDER

Allowing liability under *respondeat superior* or agency principles would "be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions." *Id.* at 290.

The Court concluded that for the district to be liable under Title IX for teacher-to-student harassment, an official of the school district must: (1) have actual notice of, and be deliberately indifferent to, the teacher's misconduct; and (2) have "authority to institute corrective measures on the district's behalf." *Id.* at 276. In applying the facts, the Court stated:

> The only official alleged to have had information about Waldrop's misconduct is the high school principal. That information, however, consisted of a complaint from parents of other students charging only that Waldrop had made inappropriate comments during class, which was plainly insufficient to alert the principal to the possibility that Waldrop was involved in a sexual relationship with a student.

*Id.* at 291. As the district did not have actual notice of the harassment, it was not liable under Title IX.

In 1999, the Supreme Court extended a recipient's liability under Title IX for deliberate indifference to known harassment from teacher-to-student harassment to, "in certain limited circumstances," student-to-student harassment. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). For student-to-student harassment, the recipient is only liable "for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefits." *Id.* at 633.

Davis's fifth-grade daughter was the victim of prolonged sexual harassment by a classmate. Over the course of several months, the male classmate rubbed against the victim in a sexually suggestive manner and made suggestive comments. The victim and her mother reported the harassment to several teachers. The teachers did nothing to prevent the harassment. After months of complaints, teachers finally moved the victim's seat away from the harasser's seat.

9 – OPINION AND ORDER

Rather than act to stop the harassment, the principal asked the mother why her daughter was the only one complaining. The harassment ended only when the classmate pleaded guilty to sexual battery.

After confirming that Title IX holds recipients liable "only for its own misconduct," *id.* at 640, the Court clarified that Davis did not seek to hold the recipient liable for the classmate's misconduct. Rather, Davis sought to hold the school board "liable for its *own* decision to remain idle in the face of known student-on-student harassment in its schools." *Id.* at 641.

The Court went out of its way to explain that it was not dramatically expanding recipient liability:

> This is not to say that the identity of the harasser is irrelevant. On the contrary, both the "deliberate indifference" standard and the language of Title IX narrowly circumscribe the set of parties whose known acts of sexual harassment can trigger some duty to respond on the part of funding recipients. *Deliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action.* . . . The statute's plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs. . . . Moreover, because the harassment must occur "under" "the operations of" a funding recipient, the harassment must take place in a context subject to the school district's control. These factors combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs. Only then can the recipient be said to "expose" its students to harassment or "cause" them to undergo it "under" the recipient's programs.

*Id.* at 644 (emphasis added) (internal citations omitted).

Because the harassment occurred mainly in the classrooms during school hours, the recipient "retain[ed] substantial control over the context in which the harassment occur[ed]. *Id.* at 646. Importantly, because elementary schools necessarily have a custodial relationship with their

young students, the recipient there exercised significant control over the harasser. *Id.* The court concluded:

> The fact that it was a teacher who engaged in harassment in *Franklin* and *Gebser* is relevant. The relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity. Peer harassment, in particular, is less likely to satisfy these requirements than is teacher-student harassment."

*Id.* at 653.

Despite Ms. Samuelson's attempts at distinguishing the facts here, the reasoning in *Davis* and *Gebser* bars her Title IX claim. Advance notice and the ability to take corrective action remain prerequisites for recipient liability in Title IX sexual harassment actions. Here, Ms. Samuelson's harasser drugged Ms. Samuelson at an off-campus party.[3] OSU had no control over an off-campus party at an apartment that simply happened to be located in the same city as the university. And Ms. Samuelson's rape occurred not on campus, where the OSU might exert some control over the comings and goings of students or guests, but at another off-campus apartment.

Further, OSU lacked the ability to exercise any control over Ms. Samuelson's harasser. Ms. Samuelson alleges her attacker "was not a student, and was visiting from Portland." Compl. ¶ 8. OSU does not exercise control over every adult who happens to visit Corvallis. There are no allegations that OSU had any contact at all with Ms. Samuelson's harasser, or that the harasser ever set foot on school property. The only apparent connection between OSU and Ms. Samuelson's harasser is that Calvin Carlyle, the harasser's cousin, played football at OSU. As noted in *Davis*, "[t]he relationship between the harasser and the victim necessarily affects the

---

[3] I use the term "harasser" to comport with the language of Title IX and *Davis*. I do not mean to suggest that Ms. Samuelson's rape was mere harassment.

extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity." 526 U.S. at 653. Because the OSU had no relationship at all with Ms. Samuelson's harasser, and no control over the context of the harassment, it cannot be liable for the harassment under Title IX. *See Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 739 (9th Cir. 2000) (for recipient liability for student-to-student harassment, the recipient must have substantial control over the harasser and the context of the harassment).

Ms. Samuelson relies on the Tenth Circuit's opinion in *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170 (9th Cir. 2007), a case Ms. Samuelson argues is directly on point. Far from helping her Title IX claim, *Simpson* reinforces that Ms. Samuelson's argument extends Title IX recipient liability beyond anything ever recognized by any other court. The crucial differences between *Simpson* and this case are that, unlike in *Simpson*: (1) Ms. Samuelson's rape did not occur during an official OSU sponsored program; and (2) OSU did not expressly invite Ms. Samuelson's harasser onto its campus.

*Simpson* concerned Title IX recipient liability from the December 2001 sexual assaults of several female University of Colorado (CU) students by CU football players and recruits. As part of its official football recruiting program, the university wanted to show recruits "a good time" and paired them with female "ambassadors" and player-hosts. CU's success on the football field depended in large part on the success of its official recruiting program, a program "that CU sanctioned, supported, [and] even funded." *Id.* at 1177. Absent proper oversight, the program practically encouraged sexual assaults, essentially turning CU's female "ambassadors" into unwitting prostitutes. In fact, before going to plaintiffs' apartment, some of the recruits had been promised the opportunity to have sex with the "ambassadors." And, of course, what would "a

12 – OPINION AND ORDER

good time" be without providing the men with alcohol? The ensuing result was that several recruits and football players sexually assaulted several female students.

The December 2001 assaults were not the first sexual assaults involving the CU football team or even its official recruiting program. In 1997, CU recruits sexually assaulted a high-school female at a party hosted by a football player. The district attorney met with CU officials, informing the officials of the need for sexual assault prevention training for players and policies for supervising recruits. Rather than implement any changes, CU coaches responded in ways that encouraged future incidents. *Id.* at 1173-74.

Plaintiffs alleged the university "knew of the risk of sexual harassment of female CU students in connection with the CU football recruiting program and that it failed to take any action to prevent further harassment before their assaults." *Id.* at 1174. Although the parties viewed the case as one involving student-on-student harassment, the court noted the allegations— that an official school program lead directly to sexual assaults—did not align perfectly within the *Gebser* (teacher-on-student harassment) or *Davis* (student-on-student) framework. *Id.* at 1177. The court noted that *Gebser* indicated recipients with official policies leading to harassment could be liable under Title IX under municipal liability theories found in 42 U.S.C. § 1983 cases. *Id.* at 1176. This municipal liability theory, known as the *Monell* framework, provides:

> [I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 1178 (quoting *Monell v. Dept of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978)).

The *Simpson* court concluded a recipient can intentionally act in violation of Title IX "when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient." *Id.* at 1178. In describing an "obvious" need for training, the court quoted an example from *City of Canton v. Harris*, 489 U.S. 378 at 390 (1989), a Supreme Court case—also referenced in *Gebser*—dealing with *Monell* liability:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 1178-79 (quoting *Canton*, 489 U.S. at 390).

But the example from *Canton* demonstrates why Ms. Samuelson's claim fails even under a *Monell* framework. Ms. Samuelson was assaulted not by an OSU student, but by the cousin of an OSU student. Even assuming OSU knew of an "obvious" need for sexual assault training, no one connected to the university sexually assaulted Ms. Samuelson. Ms. Samuelson's theory would extend municipal liability discussed in *Canton* well beyond the municipal officer's own use of deadly force. Instead, Ms. Samuelson's theory would render the municipality liable for the use of deadly force by an associate of an off-duty officer. This expands municipal liability well beyond instances under the control and direction of the municipality. Ms. Samuelson's theory goes well beyond *Monell* liability, and well beyond even *respondeat superior* or agency liability.

*Simpson* did not eliminate the requirement that the recipient have at least a modicum of control of the harasser and the context of the harassment in Title IX official policy claims. To the contrary, *Simpson* recognized that "Implementation of an official policy can certainly be a

14 – OPINION AND ORDER

circumstance in which the recipient exercises significant 'control over the harasser and the environment in which the harassment occurs.'" *Id.* at 1178 (quoting *Davis*, 526 U.S. at 644). And there is no doubt that the recruits in *Simpson* were at least partially under the control of CU. CU officially invited the recruits to visit under existing NCAA regulations. The recruiting program was an officially sanctioned, supported, and funded school program with the official policy of assigning player-hosts to show recruits "a good time." CU could vet the recruits in some manner, and exerted at least some control over the recruits.

OSU, however, had no connection at all to Ms. Samuelson's rapist. OSU had no chance to vet Calvin's cousin as he drove from Portland to an off-campus apartment in Corvallis. And Ms. Samuelson was not raped during an activity sanctioned, supported, and funded by OSU. Because OSU lacked any control over the harasser or the context of the harassment, it is not liable under Title IX.

To the extent Ms. Samuelson argues OSU violated Title IX with its deliberate indifference in responding to her report of the rape, her claim is barred by the statute of limitations. As a Title IX action is a civil rights action, courts "borrow the most appropriate state statute of limitations." *Stanley v. Tr. of California State Univ.*, 433 F.3d 1129, 1134 (9th Cir. 2006) (quoting *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 974 (9th Cir. 2004)). Like § 1983 claims, Title IX claims use the state's personal injury statute of limitations. *Id.* In Oregon, the statute of limitations for personal injury claims is two years. *J.M.O. v. Keesee*, 2015 WL 2380944 at *1 (D. Or. 2015).

In determining when a Title IX claim begins to run, courts look to federal law:

[T]he touchstone for determining the commencement of the limitations period is notice: a cause of action generally accrues when a plaintiff knows or has reason to know of the injury which is the basis of his action. The proper focus is upon the

15 – OPINION AND ORDER

time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful.

*Stanley*, 433 F.3d at 1136 (quoting *Hoesterey v. City of Cathedral City*, 945 F.2d 317, 319 (9th

Cir. 1991) (internal quotations and citations omitted)).

Ms. Samuelson appears to argue OSU violated Title IX when its sexual assault counselor

essentially did nothing other than blame Ms. Samuelson for being raped. In describing this

shamefully inadequate response to the rape, Ms. Samuelson alleges:

> OSU was deliberately indifferent to reports of rape and sexual misconduct by (a) failing to investigate reports of rape and sexual misconduct by Ms. Tracy and Plaintiff properly, (b) failing to notify law enforcement of Plaintiff's rape, (c) discouraging Plaintiff from reporting the sexual assault to law enforcement, (d) minimizing or covering up the discriminatory import of Ms. Tracy's and Plaintiff's reports of sexual assault to OSU, and (e) continuing to use ineffective methods to address sexual assaults of OSU's female students as more specifically described in paragraph 25, herein fully incorporated by reference.

Compl. ¶ 31.

But Ms. Samuelson learned of OSU's deliberate indifference to her report of rape when

OSU was in fact deliberately indifferent to her own report of the assault. That Ms. Samuelson

later learned OSU was also deliberately indifferent to earlier rapes does not somehow restart the

statute of limitations for Ms. Samuelson's own claim. Ms. Samuelson also alleges she did not

learn of the reason for OSU's deliberate indifference until reading the 2014 newspaper article:

> OSU's deliberate indifference was intended to protect its fundraising efforts, which were heavily dependent on donors' positive regard for OSU's football program and the image of a safe campus, and consequently OSU subjected Plaintiff to a hostile educational environment so severe, pervasive, and objectively offensive that it effectively barred her access to educational opportunities and benefits.

Compl. ¶ 32.

But learning why OSU was deliberately indifferent does not restart the statute of

limitations for Ms. Samuelson's Title IX claim. Because Ms. Samuelson knew of OSU's
16 – OPINION AND ORDER

deliberate indifference to her report of sexual assault on October 11 or 12, 1999, compl. ¶ 10, this portion of her Title IX claim, to the extent she makes such a claim, is barred by Oregon's two-year statute of limitations for personal injury actions.

## II. Due Process Claim Against Mr. Riley

Ms. Samuelson's § 1983 due process claim alleges Mr. Riley violated her constitutional right to be free from bodily harm. Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Serv.*, 489 U.S. 189 (1989). *DeShaney*, however, suggested that state inaction could lead to a due process violation when, for example, the state is aware of danger and actually makes someone more vulnerable to harm. *Id.* at 201.

In 1992, the Ninth Circuit discussed this "danger creation" exception. *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992). This exception applies only in limited circumstances, when the state official's action creates "an actual, particularized danger" the plaintiff would not have faced absent the official's affirmative act. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006).

Even under the "danger creation" exception, Mr. Riley is clearly entitled to qualified immunity. "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dunn v. Castro*, 621 F.3d 1196, 1198-99 (9th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts shall resolve qualified immunity questions "at the earliest possible stage in litigation." *Id.* at 1199 (quoting *Harlow v. Bryant*, 502 U.S. 224, 227 (1991)).

17 – OPINION AND ORDER

In determining if an official is entitled to qualified immunity, courts look at two issues: (1) whether the plaintiff alleged facts establishing the violation of a constitutional right; and (2) "whether the right is clearly established such that a reasonable government official would have known that 'his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 121 (2001)). While the first prong is a factual inquiry, the second prong is a question of law. *Id.* Courts must determine whether "the preexisting law provided the defendants with 'fair warning' that their conduct was unlawful. *Dunn*, 621 F.3d at at 1200 (quoting *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1137 (9th Cir. 2003)). As relevant here, did preexisting law as of 1999 provide Mr. Riley with notice that his actions were unlawful?

In 1992, the Ninth Circuit discussed the "danger creation" exception. *See L.W.* 974 F.2d at 121-22. L.W., a registered nurse at an Oregon custodial institution, was raped by an inmate. The inmate was a violent sexual offender with a prison file stating he would likely commit a violent crime if alone with a female. L.W.'s supervisors placed her alone with the inmate, and he raped L.W. The court held that the defendants were liable as they "affirmatively created the dangerous situation which resulted" in the rape which would not otherwise have occurred. *Id.*

In 1997, the Ninth Circuit denied qualified immunity to officers who responded to a call of a seriously ill man, "found him to be in grave need of medical care," cancelled the request for a paramedic, locked the man inside his house, and left the man to die. *Penilla v. City of Huntington Park*, 115 F.3d 707, 708-09 (9th Cir. 1997) (*per curiam*). The officer's affirmative actions "clearly placed Penilla in a more dangerous position than the one in which they found him." *Id.* at 710. Because the law was clearly established that "a state actor in this circuit has a constitutional duty under the due process clause to protect an individual where the state places that individual in danger through affirmative conduct," the court concluded the officers were not

18 – OPINION AND ORDER

entitled to qualified immunity. *Id.* at 711. The "critical distinction" was "the stark one between state action and inaction in placing an individual at risk." *Id.* at 710.

In 2000, the Ninth Circuit denied qualified immunity to officers who ejected a drunk man—wearing jeans and a t-shirt on a night with a wind chill factor of minus 20 degrees— from a bar, told him not to drive his car, and the man died from hypothermia. *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082 (9th Cir. 2000). In examining whether the officers affirmatively placed the man in danger, the court asked "whether the officers left the person in a situation that was more dangerous than the one in which they found him." *Id.* at 1086.

As of 2000, one year after Mr. Riley's alleged constitution violation, the "danger creation" exception required the state actor to take affirmative action increasing the risk to the individual. Far from alleging Mr. Riley took affirmative action placing her at risk, Ms. Samuelson instead alleges Mr. Riley's inaction—in failing to adequately discipline Calvin following his rape of Tracy and in generally allowing a sexually violent culture to exist in the football program—increased the risk that she would be harassed. These actions or, more appropriately, inactions, fall well short of those needed under the "danger creation" exception. Mr. Riley did not drop Ms. Samuelson off at the off-campus party or take the drug-filled beverage from Calvin's cousin and hand it to Ms. Samuelson. There is no allegation Mr. Riley ever met or even heard of Calvin's cousin before the filing of this action. Although Ms. Samuelson argues Mr. Riley only suspended Calvin one game after Ms. Tracy's rape, Calvin did not rape Ms. Samuelson. Because there is no allegation of an affirmative action by Mr. Riley increasing the risk that Ms. Samuelson would be sexually assaulted by Calvin's cousin, Mr. Riley is entitled to qualified immunity.[4]

### III. Equal Protection Claim Against Mr. Riley

To prevail on this claim, Ms. Samuelson must demonstrate that Mr. Riley intentionally discriminated against her based on her gender and treated her differently from similarly situated male students. "[T]he right to be free from intentional gender discrimination by a state actor was clearly established as early as 1988." *Oona ex rel. Kate S. v. McCaffrey*, 143 F.3d 473, 476 (9th Cir. 1997). Although Ms. Samuelson points to *Oona* in support of this claim, *Oona* bears little resemblance to the facts here.

In *Oona*, the court denied qualified immunity to a teacher, a principal, and the Director of Elementary Education of a school district. The teacher there "allegedly fondled, kissed, straddled and otherwise inappropriately touched Oona and other students." 143 F.3d at 474. The principal witnessed some of the acts, and refused to remove the teacher when asked. Harassment of female students by male students occurred for several months. One male student "struck Oona in the face and told her to 'Get used to it.'" *Id.* at 475. When parents complained to the principal and the director, the teacher lowered Oona's grade. All of the individual defendants knew the victim, knew of the abuse, and retaliated against the victim for reporting the abuse. There is no allegation that Mr. Riley knew of Ms. Samuelson or her report of sexual assault. In fact, Ms. Samuelson alleges that after blaming her for the rape, OSU's sexual assault counselor "had no further contact with Plaintiff, and upon information and belief, took no further action. No one else from OSU contacted Plaintiff thereafter about the assault or, upon information and belief, took any other action either." Compl. ¶ 10.

---

[4] Mr. Riley raises strong arguments that the claims against him are barred by the statute of limitations. Because it is clear Mr. Riley is entitled to qualified immunity, I need not discuss the statute of limitations hurdles Ms. Samuelson faces.

Ms. Samuelson argues that "rape constitutes sex discrimination." Resp. 12. While that is certainly true, it is irrelevant to Ms. Samuelson's equal protection claim against Mr. Riley. Mr. Riley was not aware of the rape of Ms. Samuelson and, according to the allegations, had never even met Calvin's cousin.

Because there are no allegations that Mr. Riley purposefully discriminated against Ms. Samuelson, and because Mr. Riley did not know of Calvin's cousin and never knew of Ms. Samuelson's reports of sexual abuse, Mr. Riley is entitled to qualified immunity.

## CONCLUSION

The university's response to the rapes of Ms. Samuelson and Ms. Tracy was shameful, woefully inadequate, and will remain a dark stain on the history of the institution. Justice and accountability took a back seat to the outdated notion that "boys will be boys" and the truth took a back seat to the desire to attract donors and talented athletes. But equally clear is that these defendants are not liable under the tenuous Title IX, equal protection, or due process theories put forth here. For the reasons stated above, defendants' motion to dismiss, ECF No. 6, is GRANTED. Because the allegations demonstrate that leave to amend would be futile, Ms. Samuelson's claims are dismissed with prejudice. *Doe*, 58 F.3d at 497.

IT IS SO ORDERED.

DATED this _22_ day of February, 2016.

_____

Michael McShane
United States District Judge

21 -- OPINION AND ORDER